### THE VICTOR COAL COMPANY v. MUIR.

1. CONTRIBUTORY NEGLIGENCE—COMMON LAW.

Where the plaintiff (an experienced coal miner) had observed and tested a large rock in the roof of the room where he was working, and found the same to contain natural cracks or slips, and knew the rock to be a bad rock which certainly ought to be propped, and yet continued his work within a few feet of the rock without propping it until it fell and crushed his arm; *held,* that plaintiff was guilty of contributory negligence such as would bar his action at common law. The rule announced in *Lord v. Pueblo S. & R. Co.,* 12 Colo. 390, approved and applied.

2. COAL MINES STATUTE—CONSTRUCTION OF.

The primary object of the statute concerning "coal mines" (Session Laws, 1885, pp. 137–141) was to secure the health and personal safety of all persons engaged in underground coal mining. While it is the duty of the "mining boss" to see that sufficient timber of suitable lengths and sizes is placed in the working places of the mine, the duty of securely propping the roof of the mine by actually setting such timbers thereunder, is devolved upon any miner, workman, or other person having the control of any working place in the mine, and the willful neglect of such duty is a misdemeanor under the statute.

3. CONTRIBUTORY NEGLIGENCE—UNDER STATUTE.

Where the plaintiff found that he could not securely prop the roof of the mine in the working place under his control, and yet thereafter continued to expose himself to imminent danger from the falling of a large rock in the roof which he knew to be bad, and which he knew ought to be propped, and gave no notice and took no step to prop the same, and the rock fell and injured him; *held,* that he was guilty of violating the statute in not taking steps to obtain suitable timber for propping the roof, or in not giving immediate notice of its condition, and that his negligence was willful since it indicated a reckless disregard of the consequences to his own life or limb, and that such contributory negligence was a bar to his action under the statute.

4. DILIGENCE—LATENT DEFECTS.

Greater diligence should not be exacted of miners than common pru-

dence requires them to exercise, considering the circumstances under which their work is carried on. In case of injury to a miner from a defective roof, where its dangèrous condition is not obvious without critical inspection, the defect being latent and not actually known to the miner, he may not be held guilty of such contributory negligence as would prevent his recovery.

*Appeal from the District Court of Las Animas County.*

ACTION for personal injuries occasioned by alleged negligence. Defenses : general denial, contributory negligence, etc. Verdict and judgment for plaintiff. Defendant appeals.

The complaint, stripped of its formalities, is as follows :

" 1st. That plaintiff is a minor under the age of twenty-one years, wherefore he sues by his next friend and natural guardian, Robert Muir, and that defendant is a corporation duly incorporated and existing under and by virtue of the laws of the state of Colorado.

" 2d. That defendant is and was on the 17th day of September, A. D. 1889, and for a long time prior thereto, engaged in the business of coal mining, and is and was at said time the owner and proprietor of a certain coal mine in Las Animas county, known as the Victor Coal Mine, and that there were employed underground in said mine, at said time, more than ten men during each twenty-four hours, and that plaintiff was at said time an employee of defendant laboring in said mine, mining coal.

" 3d. That defendant, wholly disregarding its duty towards plaintiff, negligently failed to keep the traveling ways and working places of said mine in good repair and in safe condition, and negligently and willfully failed to furnish sufficient timbers for the purpose of propping the roof of said mine, and negligently and willfully failed to place timbers of suitable lengths and sizes in the working places of said mine, and negligently and willfully failed to secure, or see that the loose coal, slate and rock overhead was secured from falling in and upon the traveling ways and working places of said mine, and negligently and willfully failed to employ for said mine a competent and practical inside overseer or

mining boss, and that, by reason of defendant's violation of its duty and of its said negligent and willful failure to comply with its duties, on the 17th day of September, 1889, while plaintiff was laboring in said mine as the employee of defendant, mining coal, a large rock fell from the roof of said mine and fell upon the plaintiff, breaking and crushing his right arm so that it had to be amputated above the elbow, and otherwise greatly bruising and injuring plaintiff.

" 4th. That, by reason of such injuries, plaintiff suffered great mental and physical pain, and was and is maimed and crippled for life, and deprived thereby of his only means of making for himself a support and living, to plaintiff's great damage in the sum of twenty-five thousand dollars.

" Wherefore plaintiff demands judgment," etc.

From testimony of plaintiff:

(IN CHIEF.)

" Walter Muir; nineteen years old. * * * About September 17, 1889, John McDonald and I were mining coal. I had nearly finished mining when I heard a crack and jumped back, when a rock fell from the roof of the place in which I was working and caught me. It was from three and one half to four feet from the edge of the coal to the rock which fell. When I heard the crack, I supposed the coal was going to fall, and jumped back, but if I had had time to think I knew that the coal was still solid and not likely to fall. I jumped back to get out of the way of the coal.

" Q. State, if you know, what was the cause of that rock falling. A. Well, I believe if I had had a prop under it or two props—one prop I don't think would have been enough; might have had two or three props—it would, if the rock had been going to fall, given warning, but it didn't give any warning at all.

" Q. How was the room propped at that time? A. The room was pretty well propped all the way back over where

they had done all the work that was done before I was hired to work.

\*    \*    \*    \*    \*    \*    \*    \*

"Q. You can tell the jury as near as you can about in what position it caught you. A. The rock was near the center of the room, and when I jumped back I jumped behind this prop that I had set last—this nearest prop to the face. I was lying down, mining, and when I jumped back I caught my arm under the rock. It was my right arm.

"Q. You may show the jury how much of the arm was taken off. (Witness exhibits his right arm to the jury, showing that it had been amputated just above the elbow.) A. On the day of the accident, there was not any props around the ground anywhere. I looked in the morning; got only one. That was the one, I think, that we set on the side where John McDonald was working. I examined the place where props had been kept. I went out, intending to get some props that had been left at a prospect hole down along the creek, but they were gone. There were no props on the ground at the time of the accident. No props had been placed in the room where I had been working by the company, either on the day of the accident or on any previous day.

"Q. How did you get your props when you got props? A. When I started to work there the props were all one length. John McDonald measured the length, height of the coal, and then we went out on the prop pile and sawed the props, carried them down the side of the track, and in the morning would wait for the driver and put them on the truck, and go with the truck inside, and unload them when we got to the place. We were required to cut them ourselves the proper length.

"Q. I will ask you whether any one connected with the mine had been in the habit of inspecting the coal of your room and the passageway along the side of your room with regard to props and the coal overhead? A. I don't think there was anybody—no man around the mine to see the room, not while I worked in the room. There was not any one came

to look at the condition of the room, but Mr. Locke was there twice while I worked there, but I do not think he came directly to look at the room. He might have. The first time he came to measure the cross-cut between No. 8 and 9, I worked No. 8, and he measured the cross-cut and wrote 'bad.' The other time he came in with some visitors, in the morning. I was at work in the room somewhere between one and two months. * * * If there had been props under the rock, it might have fallen, but it would have given warning. The props would have bent or broken before it would fall, but it might not have fallen at all if there had been props. I was mining in the usual manner."

### (CROSS-EXAMINATION.)

" Q. Didn't you and John McDonald have some conversation about that rock before it fell? A. Well, we was looking at it and testing it.

" Q. You were testing it? A. With a pick, pounding it with the head of a pick.

" Q. For the purpose of sounding it, were you? A. Yes, sir.

" Q. You can tell by sounding, can you, whether a rock is loose? A. Yes, sir.

" Q. How long before the rock fell were you sounding it with the pick? A. I expect half an hour.

　　*　　*　　*　　*　　*　　*　　*　　*

" Q. What did you discover by sounding it with a pick? A. Well, I didn't think there was any danger in it.

" Q. Didn't think there was any danger in it, then you could not discover the fact that it was dangerous? A. No, sir.

" Q. Did McDonald say anything to you about putting a prop under that rock? A. Well, then we started to put a prop under it after we sounded it.

" Q. Yes? A. And the prop was too short and we threw it away.

" Q. You had a prop in the room, did you? A. We had a short one that had been cut the day before and the place we cut it for was too short, and then we tried it there again;

that was the second time we had tried to set it and it was too short for there too.

" Q. Did you make an effort to set a prop under that rock that fell? A. It was the prop I sawed we was trying to set.

" Q. Did you make any effort to set a prop under the rock that fell? A. Yes, sir.

" Q. When did you make that effort? A. Just when we sounded the roof, about half an hour before.

" Q. It was after you sounded the roof, you say you and McDonald had no conversation about the rock being dangerous? A. Well, not in particular, we didn't.

" Q. How did you come to make an effort to prop it? A. We knew well enough that there was a place for a prop and it ought to be set there.

" Q. You knew that was a place for a prop? A. Room to set it, yes.

" Q. Now, was there simply room to set a prop or was it a proper place for a prop? A. It is where I would have set it if it was long enough.

" Q. Very well, that was the proper place for a prop, was it not? A. Yes, sir.

" Q. How long had you been mining coal? A. Since I was 14 years old.

" Q. And how old were you at the time of this accident? A. 17.

" Q. Then you had three years experience as a miner, and you understood how to prop a roof, didn't you? A. Well, I thought I did.

" Q. And you knew that under that rock was the proper place for a prop, did you? A. Well, I would have set that one there if it would have fitted.

" Q. Now I am going to keep right after you until you answer my question, so you may as well come right to the front as to try and get away from it; you knew it was proper to put a prop under that rock, didn't you? A. Yes, sir.

" Q. And you didn't do it, did you? A. No, sir.

" Q. Now you say that you and McDonald had no conver-

sation about the dangerous character of that rock? A. Well, it was me that done most of the talking there and I told him to go and get a prop and we would set it there.

" Q. You told McDonald to go out and get a prop? A. Yes, sir.

" Q. How long before the accident was it that you told him that? A. Just when we sounded the roof.

" Q. That was about thirty minutes before the accident? A. Yes, sir.

" Q. You saw then that was dangerous, didn't you? A. Well, I didn't think that was so dangerous that there was anything very particular wrong with it.

" Q. Then why did you tell him to go and get a prop at that time? A. Well, I would set a prop there if it didn't need it, if there was room for it anyhow.

" Q. He didn't get the prop, did he? A. Yes, sir.

" Q. Where did he get it? A. It was the short one that was laying there.

" Q. You say it was too short? A. Yes, sir.

" Q. What did you do then? A. We tried to put up another that we had that was laying to one side.

" Q. One of the props you had got yourself? A. Well, we didn't get it for that place.

" Q. Then you didn't get any props for that place? A. Not yet, no.

" Q. Now, sir, isn't it a fact that John McDonald just a little while before the accident occurred called your attention to the dangerous character of that slip in the rock overhead, and told you it had better be propped, and you told him you would wait till you loaded the car with coal and then prop it, isn't that true? A. No, sir.

" Q. That is not true? A. I shoveled this coal to set that prop, and when I could not do anything with it I said we would have to try some other plan to fix it.

" Q. Well, then, didn't you tell him you would try some other plan to fix it after you loaded the car with coal? A. I can't remember what I did say about that.

"Q. You won't swear that you didn't will you? A. Well I would very likely set a prop there, no matter what kind of a roof it was.

"Q. Well, now, we are not talking about that at all; I am asking you about what McDonald told you and what you said to McDonald just a few minutes before the rock fell; now, confine yourself particularly to that, and let's get through with it. Didn't he tell you it was dangerous? A. Well, we knew there ought to be a prop under it.

"Q. Didn't you know it was dangerous? A. I didn't know it was dangerous, but I knew it was a bad rock.

"Q. Didn't he tell you it was dangerous? A. I don't think so, I don't remember.

"Q. Didn't you see a crack or slip there? A. No, sir.

"Q. You didn't? A. Not anything bad.

"Q. You didn't see anything bad? A. No, sir.

"Q. What did you see? A. Well, that there roof up there is all naturally a little cracked, but it didn't look to be any worse than any other roof.

"Q. The roof was naturally bad? A. Not naturally bad, but there was naturally cracks in it and slips too.

"Q. Natural cracks and slips in that rock? A. Yes, sir.

"Q. And you knew it? A. Yes, I knew it.

"Q. Didn't you also know from your experience as a miner that a roof of that kind must be carefully propped in order to be safe? A. Yes, it ought to be propped, certainly.

"Q. Well, didn't you know it at that time; didn't you know it at that time? A. Well, I knew it ought to be propped there.

"Q. You knew there ought to be a prop there? A. Yes, sir.

"Q. And didn't you know that unless there was a prop there it was a·dangerous place? A. I didn't think there was any danger then.

"Q. You didn't think there was any immediate danger, but you knew it ought to be propped? A. Yes, sir."

From the testimony of John Cameron, general superintendent of defendant company (witness for defendant):

"I am the general superintendent of The Victor Coal Company. My residence is near the company's property. I have been engaged in the coal mining business about twenty-six or twenty-seven years. In Las Animas county I had charge of The Colorado Coal and Iron Company's mines between seven and eight years, and have had charge of The Victor Coal Company's mines since December, 1889. I am a practical coal miner. I have dug coal. I am familiar with the practical workings of a coal mine. I am familiar with the general formation of coal mines and the contiguous strata. In an ordinary room in a coal mine twenty feet wide, two miners would advance it in two days probably three feet. It would average about a foot and a half a day, taking the face to be the thickness of the No. 1 mine of The Victor Coal Company's mine. I mean that the advance would be an average of a foot and a half, taken across the face of a room twenty feet wide. Generally, they drive one end of the room a little ahead of the other. Miners would use, on an average, about a prop and a half a day—two props one day and one prop the next. I would say that if a room had been properly propped as it was advanced, that three props would last the two miners two days, under ordinary circumstances. I was not connected with the company at the time of this accident to the plaintiff. I have since examined the room in which the accident occurred. I discovered where a large piece of rock—roof, not rock, shell of which the roof is composed—had fallen out, about fifteen feet long and four feet wide at the widest part. It was what is called a water-break—water-slip. The water, passing around that particular point has separated that particular stone from the surrounding strata. The water percolating down through the overlying strata forms a separation, causing this particular rock to fall. The water percolating formed a smooth surface around this particular piece of rock and separated it entirely from the other strata, and at the point of separation

the surface is smooth and glossy. The edge of the piece that had fallen out ran to what miners term a 'feather edge.' I went into the mine to examine the place of the accident with Henry Locke, the pit boss. He indicated to me the location of the accident. If there had been a prop under the rock, it would not have fallen. Props are to hold up the roof. From my familiarity with coal mines and my examination of the place of the accident, I would say that the accident might have happened if the room had been sufficiently propped, but the probabilities are that it would not have happened. I do not think the room could have been sufficiently propped and still that piece of rock fallen from the roof. There should have been a prop just where the stone fell out. * * * These slips or water-breaks are frequently in a roof and not discernible. In such a case, a roof may be properly propped and still an accident occur. But in this particular instance, judging from the appearance of the room, I should say that the proper place for a prop was just where this rock fell."

Mr. CALDWELL YEAMAN, Mr. D. C. BEAMAN and Messrs. PATTISON & EDSALL, for appellant.

Mr. THEODORE SMITH and Messrs. GORDON & HENDRICKS, for appellee.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

The principal questions requiring consideration on this appeal are: *First*, did plaintiff's own negligence contribute to cause the injury complained of? *Second*, is contributory negligence a defense in an action of this kind under the statute hereinafter cited?

1. At the time the plaintiff was injured, he was employed by the defendant company mining coal in its mine. He was working with one John McDonald, a boy fifteen years of age, in the same room or working place of the mine, when a

rock fell from the roof of the mine, caught his right arm, and crushed it so that it had to be amputated above the elbow.

That plaintiff was negligent in knowingly and voluntarily continuing to work in such an exposed place without putting any prop under the rock which fell, is manifest from his own testimony. The testimony of Superintendent Cameron makes the case still more clear. The record shows no evidence contradicting the testimony of these witnesses as to any material matter bearing upon the question of plaintiff's conduct, nor do the facts and circumstances of the case leave room for any substantial difference of opinion between intelligent and upright men that plaintiff acted negligently in thus remaining exposed to imminent danger. The case falls clearly within the rule announced in *Lord v. Pueblo S. & R. Co.*, 12 Colo. 390.

The general rule at common law is that contributory negligence is a defense in actions of this kind, and when clearly established by evidence substantially uncontradicted, is to be adjudged a defense as a matter of law by the court. See *Lord Case*, *supra*, and decisions and authorities there cited.

Though plaintiff was only seventeen years of age when he was injured, yet he had had three years' experience in mining coal, and had worked in the room or working place where he was injured for several weeks before the injury. There is no claim that he was not as well advised and as competent to care for himself as any miner of mature age and judgment. He had observed and *tested the rock—sounded it—pounded it with his pick—a half hour before it fell. He knew of the natural cracks or slips in the rock—knew it was a bad rock—knew that it was proper to put a prop under the rock—knew certainly that it ought to be propped.* All this he testified to, though with seeming reluctance, upon cross-examination; and yet, because there were no props of suitable length at hand, he continued his work within a few feet of the rock until it fell. His testimony, that he did not know the rock was dangerous, or that he did not think there was any danger *then*, cannot be accepted in view of his knowledge of the actual condition

of the rock as testified to by himself. It is clear that he neglected a known duty, and in consequence of such neglect was injured. This was contributory negligence such as would bar his action at common law.

Plaintiff's condition is truly unfortunate; but his unfortunate condition is not *of itself* sufficient to make defendant liable in damages. Where the injury which a person suffers has been occasioned by his own negligence, or where his own negligence has contributed to cause such injury, the law does not, as a general rule, entitle him to relief against another party whose negligence has also in part occasioned the injury. No rule for apportioning the damages has been devised for such cases; and it is not the province of the courts, without legislative aid, to devise such a rule. There are some well recognized exceptions, or seeming exceptions, to the general rule that contributory negligence is a defense; but the rule itself is firmly established upon the meritorious ground that it stimulates to greater diligence, and thus tends to prevent injuries to persons and property. In *Wells v. Coe*, 9 Colo. 162, it is said: "Where injury is suffered by an employee through defects in the machinery or appliance furnished by his employer and used in the business, if the employee knew, or had any means of knowledge equal to that of his employer concerning such defects, yet continued in the latter's service, he cannot recover; provided no inducement, such as a promise to cure the defect, and thus remove the danger, led him to remain."

In *Colo. Midland Ry. Co. v. O'Brien*, 16 Colo. 225, the following language, appropriate to the present case, was used: "Plaintiff must be held to have voluntarily assumed all the usual and ordinary dangers incident to his employment; he is not entitled to recover damages resulting from such dangers; nor could he *voluntarily* and *knowingly* incur unusual and extraordinary dangers at the risk of his master." Then follow certain exceptional rules, not appropriate in this case, because the facts and circumstances of this case are different

from the *O'Brien Case*, and so do not warrant the application of such exceptional rules.

Even if it be conceded that the defendant company was negligent in not furnishing suitable props, in not properly inspecting and guarding the mine against danger to its employees, or in not being more diligent in other respects, nevertheless, the record shows no evidence by which plaintiff's case can be brought within any of the usual common law exceptions relieving him from the consequences of his own contributory negligence. It does not appear that there was any promise by the defendant company or its representative that the rock should be propped, or otherwise secured, nor even that the company or its representative had notice of the actual condition or character of the rock before it fell; nor was plaintiff commanded by defendant or its representative to continue work in the room under pain of being discharged from employment if he disobeyed. It does appear, however, without conflict in the evidence, that plaintiff, in the presence of imminent danger, known, so far as appears, only to himself and his younger companion, voluntarily, without promise or command from his employer, risked all injury which might befall his life or limb from the falling of the rock, without making any effort to escape, or to protect himself, or to give notice to his employer, or to any one else, of the impending danger. We must not be understood as intimating that the condition of the rock in this case was such that an experienced miner might have risked himself under or near it, even upon the promise or command of his employer. It is not every kind of risk that may be thus excused. See *O'Brien Case, supra;* also, *District of Columbia v. McElligott*, 117 U. S. 621.

2. In behalf of plaintiff it is claimed that even if he was guilty of negligence contributing to cause the injury, he is nevertheless entitled to recover in this action. This claim is based upon the statute concerning "Coal Mines." Session Laws, 1885, pp. 137–141. The following are some of its provisions:

"SEC. 4. The owner or agent of every coal mine * * *

shall employ a practical and competent inside overseer, to be called a 'mining boss,' who shall keep a careful watch over the ventilating apparatus, and the airways, traveling ways, pumps, timbers and drainage; also, shall see that, as the miners advance their excavations, that all loose coal, slate and rock overhead are carefully secured against falling in or upon the traveling ways, and that sufficient timber, of suitable lengths and sizes, is furnished for the places where they are to be used, and placed in the working places of the mines. * * *

"SEC. 10. Any miners, workmen, or other person, * * * who willfully neglects or refuses to securely prop the roof of any working place under his control * * * shall be deemed guilty of a misdemeanor, and upon conviction may be punished by a fine of not less than twenty-five dollars, nor more than two hundred dollars, or may be imprisoned in the county jail not less than thirty days, nor more than one year, or may be punished by both such fine and imprisonment, at the discretion of the court.

"SEC. 12. For any injury to person or property occasioned by any violation of this act, or any willful failure to comply with its provisions by any owner or lessee or operator, of any coal mine or opening, a right of action against the party at fault shall accrue to the party injured for the direct damages sustained thereby." * * *

In Tennessee it is provided by statute, " in order to prevent accidents upon railroads," that certain specific regulations shall be complied with by railroad companies and their employees, among others, that " every railroad company shall keep the engineer, fireman or some other person upon the locomotive always upon the lookout ahead ; " and, further, that " every railroad company that fails to observe these precautions, or cause them to be observed by its agents and servants, shall be responsible for all damages to persons or property, occasioned by, or resulting from any accident or collision that may occur." See Code of Tennessee (Milliken & Vertrees, Ed. 1884), pp. 245, 246.

The construction of this statute by the supreme court of

Tennessee is to the effect that where an accident occurs by reason of noncompliance on the part of the railroad company with the statutory requirements, the right of action in favor of the injured party is absolute, and that his contributory negligence is not a bar to the action, though it must be considered in mitigation of damages. *Nashville & Chattanooga R. R. Co. v. Smith*, 6 Heiskell, 174; *Railroad v. Walker*, 11 Heiskell, 383; *Nashville & Chattanooga R. R. Co. v. Nowlin*, 1 B. J. Lea, 523.

The view that contributory negligence, though not a defense, must be considered in mitigation of damages, is contrary to the general rule that "whenever it (contributory negligence) is a defense at all, it is a complete defense to the action." Beach on Contributory Negligence, sec. 69. The Tennessee rule may have produced substantial justice as applied to the facts of the particular cases above cited. But is the rule safe for all kinds of cases? May a person voluntarily station himself upon a railroad track over which he knows trains are liable to pass at any time, and then hold the railroad company responsible in damages, however small, on the ground that the company had neglected some of the requirements of the statute? If so, a person may voluntarily bring an injury upon himself, and then hold another responsible in damages therefor.

Counsel cite numerous cases arising under statutes requiring railroad companies to fence their right of way, and making them liable for injuries to live stock occasioned by their neglect or failure to fence. *Cressey v. Railroad*, 59 N. H. 564; *F. & P. M. Ry. Co. v. Lull*, 28 Mich. 510; *Congdon v. Railroad Co.*, 56 Vt. 390; *Corwin v. N. Y. & E. R. R. Co.*, 13 N. Y. 42. Some of these cases hold that where an owner of domestic animals allows them to graze upon his own land adjacent to a railroad not fenced as required by statute, he is not prevented from recovering damages for the killing of such animals by passing trains, even though he had notice that the road was not fenced when he turned out his stock to graze. This view is unobjectionable. A rule that would

hold the owner of live stock guilty of contributory negligence under such circumstances would defeat the obvious purpose of the statute. It would enable a railroad company to rely upon its own neglect of duty as a defense against injuries arising from such neglect; and the more manifest the neglect, the more certain the defense, because the more likely the owner would be to have notice of the neglect. Thus the railroad company's own negligence would become its own protection. Contributory negligence, to constitute a defense, must have a different foundation. Merely allowing live stock to graze under such circumstances is not contributory negligence. As was said by Mr. Justice Stanley in *Cressey v. Railroad, supra:* " If the liability of the defendants (the railroad company) depends on the exercise of ordinary care by the plaintiff, the defendants need never fence their road, so far as respects adjoining owners. The plaintiff could not enjoy the full benefit of his land. He could only make such use of it as would not require it to be inclosed. His use of it would depend on the pleasure of the defendants. It is not contributory negligence, within the meaning of the rule, for the owner to pasture his stock upon his own land because the railroad fails to discharge its statutory duty and fence its road. Whether the defendants would be liable if the plaintiff willfully drove his mare upon the railroad, or drove her and left her in an exposed situation, we need not consider, since the facts stated do not raise such a question."

The case of *Litchfield Coal Co. v. Taylor*, 81 Ill. 590, is much relied on to sustain the view that contributory negligence is not a defense in actions of this kind. In one count of the declaration it is averred that the coal company willfully used uncovered cages to hoist and lower into its mine persons employed to work therein, and that Taylor was injured in consequence of being carried in an uncovered cage. Upon this phase of the case the supreme court of Illinois said:

" The sixth section of the act required appellant to provide a safe means of hoisting and lowering persons at the mines, with a sufficient cover overhead on every box or carriage

used for hoisting purposes, for the protection of persons hoisted or lowered into the mines. The 14th section declares: 'For any injury to person or property occasioned by any willful violations of this act or willful failure to comply with any of its provisions, a right of action shall accrue to the party injured for any direct damages sustained thereby.'

"Where an action is brought to recover for an injury resulting from the negligence of another, which was not wanton or willful, it is an essential element to a recovery that the plaintiff or party injured must have exercised ordinary care to avoid the injury; but, as we understand the authorities, where the injury has been willfully inflicted an action may be maintained, although the plaintiff or party injured may not have been free from negligence."

Notwithstanding the view thus expressed, yet the court, in the same opinion, said that the question whether Taylor was in the exercise of due care was submitted to the jury with an instruction that they should find for the defendant "if they believed from the evidence the said Taylor did not exercise due care, and that his death would not have happened but for his own negligence;" and the court further expressed the opinion that the evidence did not "justify the theory that the misconduct of the deceased materially contributed to the injury."

The case of *Durant v. Lexington Mining Co.*, 97 Mo. 62, is also relied on by counsel for plaintiff. The Missouri statute required, among other things, that "the owner, agent or operator of every coal mine operated by shaft shall provide suitable means of signaling between the bottom and the top thereof; and shall also provide safe means of hoisting and lowering persons in a cage covered with boiler iron, so as to keep safe, as far as possible, persons descending into and ascending out of said shaft." Section 8 provides : "The top of each and every shaft, and the entrance to each and every intermediate working vein, shall be securely fenced by gates properly covering and protecting such shaft and entrance thereto." Sec-

tion 14 enacts: "For any injury to persons or property, occasioned by any willful violation of the act, or willful failure to comply with any of its provisions, a right of action shall accrue to the party injured for any direct damages sustained thereby."

Upon the question of contributory negligence the court observed:

"The next contention of the appellant is that knowledge on the part of the plaintiff that the cage was not covered with iron, and that no contrivance had been provided for signaling from top to bottom of the shaft, and that the top of the shaft had no gates or other protection, should defeat the action. Such a declaration of law would in effect nullify the statute. Knowledge *only* by the plaintiff of the failure of defendant to have the mine provided with these protections will not defeat the action. It must be remembered that the plaintiff, to prevail, must show a willful violation or failure to comply with the statutory regulations. Our statute seems to be the same as that of Illinois, and it has been held there that, though the injured person may not have been entirely free from fault, still if the jury found that the willful conduct of the defendant resulted in injury, the verdict would be justified. *Litchfield Coal Co. v. Taylor*, 81 Ill. 590. *But we do not say in this case that plaintiff could recover if guilty of negligence himself.*

"There is evidence in this case that plaintiff was out of his place when in the cage, and that he should have pushed the pit car into the cage. On the other hand, there is evidence that he had directions from the pit boss to pull the car in, and that he had been provided with hooks to do the work as he did, and that he was not negligent. *Whether he was guilty of negligence contributing to the injury was submitted to the jury on various instructions favorable to defendant.*"

It will be observed that neither the Illinois case, nor the Missouri case, *supra*, fully sustains the contention of plaintiff that contributory negligence can never be a defense under the statute.

The question involved in this case is one of great magnitude. Considering the hundreds and thousands of persons employed in the various coal mines of the state, it is important that all classes of miners and mine owners shall understand the nature of the liability imposed by the statute, and particularly that they shall know whether contributory negligence may or may not, under any circumstances, constitute a defense to an action based upon the statute.

The statute requires certain things to be done by the owners or agents of coal mines, and provides in case of a willful failure to comply with its provisions that a right of action *against the party at fault shall accrue to the party injured,* etc. Undoubtedly, such willful failure constitutes negligence *per se;* and when such negligence causes injury to another, a cause of action *prima facie* accrues to the injured party. But there is no express provision of the statute to the effect that contributory negligence shall never constitute a defense to such action. The right of action is given *against the party at fault.* But suppose the injured party is also at fault? The statute in terms gives the right of action in favor of the injured party and against the party whose fault alone occasions the injury, not against the party whose fault would not have occasioned the injury but for the fault of the plaintiff himself. Nothing is said about a right of action accruing to the party injured in case the injury is caused by his own failure to comply with the statute, as well as by the failure of some other party. Unless there be something in the language of the statute, or in its manifest object and purpose requiring a different construction in order to make it effective, the statute should be construed according to common law principles; that is, contributory negligence should be held a defense in proper cases, unless the statute by its terms or manifest purpose forbids such a construction.

Counsel claim that the statute should be favorably construed in behalf of plaintiff, since it was passed in obedience to the following provision of the constitution:

" The general assembly shall provide by law for the proper

ventilation of mines, the construction of escapement shafts, and such other appliances as may be necessary to protect the health and secure the safety of the workmen therein ; and shall prohibit the employment in the mines of children under twelve years of age." Art. 16, sec. 2.

We are unable to see how this provision particularly affects the construction to be given to the statute, except as it shows constitutional direction for its passage. The statute, like other statutes, is to be so construed as to best promote its objects.

Considering the various sections of the statute, it is clear that its primary object—its manifest purpose—was to secure the health and personal safety of all persons engaged in underground coal mining. Its primary object was not to create new rights of action in favor of miners against their employers. The granting of additional rights of action was intended to insure the enforcement of the statutory regulations for the protection of the health and safety of those engaged in such mining pursuits. This is as apparent from section 10 as from section 12. Section 4 makes it the duty of the " mining boss," among other things, to see that sufficient timber of suitable lengths and sizes is placed in the working places of the mine ; but by section 10, the duty of securely propping the roof of a mine by actually setting such timbers thereunder, is devolved upon *any miner or workman, as well as upon the mining boss, or other person having the control of any working place in the mine,* and the willful neglect of such duty is made a misdemeanor punishable by fine or imprisonment or both.

3. When plaintiff found that he could not securely prop the roof of the working place under his control, and yet thereafter continued to expose himself to imminent danger from the falling of the rock, he was not only guilty of contributory negligence as held at common law, but he was guilty of violating section 10 of the statute in not taking steps to obtain suitable timber for propping the mine, or in not giving immediate notice to his employer or its representative

of the condition of the roof, so that suitable timber might be furnished for propping the same. It is true there was evidence tending to show that there were no props about the premises of the defendant company, but there was also much evidence to the contrary; so that the question whether the defendant company was or was not guilty of willful neglect, in the sense contemplated by the statute, is not free from doubt under the evidence.  ·But it is· clear that plaintiff knowingly and voluntarily neglected his duty in the very matter which brought about his injury. His contributory negligence may therefore be said to have been willful.  To hold that such contributory negligence is not a defense, certainly would not tend to promote the observance of the various requirements of the statute. On the contrary, such a holding would tend to decrease diligence on the part of employees, since it would enable them to carelessly and willfully expose their lives and limbs at the risk of their employers. This would tend to defeat, rather than to promote, the primary object and purpose of the statute. The construction of a statute which tends to defeat its object is certainly to be avoided.

Law writers have classified negligence by such distinguishing names as *slight, ordinary*, and *gross;* to·these the courts have added the term *willful.* Since negligence means inadvertence or carelessness, words implying an absence of thought, care, or intention, it has been said that the term *willful negligence* is a misnomer; nevertheless, the term has come to have a well settled signification in the law. When a person charged with an important duty voluntarily does or omits something in respect to such duty, indicating a reckless or wanton disregard of consequences to the rights or personal safety of another, his conduct is characterized as willful negligence.  Negligence and contributory negligence are of the same *intrinsic nature (D. & R. G. R. R. Co. v. Ryan*, 17 Colo. 102); hence, we have spoken of plaintiff's contributory negligence in this case as willful, since his conduct in-

dicated a reckless disregard of consequences to his own life or limb.

4. Greater diligence should not be exacted of miners than common prudence requires them to exercise, considering the circumstances under which their work is carried on. In some cases the dangerous condition of the roof of a mine may not be obvious without critical inspection. The defect may be latent, and not actually known to the miner, even though the mining boss might discover the same by keeping the careful watch and taking the precautions to keep the roof from falling which the statute imposes upon him as a special duty. In case of accident and injury to the miner under such circumstances, he might not be held guilty of such contributory negligence as would prevent his recovery. The negligence in such case might be attributable to the mining boss, or, perhaps, to the company itself. But where a miner knowingly and voluntarily exposes himself to the falling of a defective roof which he has inspected, and found to be so defective that a miner of common prudence should deem it unsafe, his negligence is to be held willful and sufficient to preclude his recovery for an injury brought upon himself for such exposure.

Our conclusion is that the trial court should have granted a nonsuit, or directed a verdict for defendant upon the evidence. This court has adopted a liberal rule for the determination of questions of negligence and contributory negligence, as an examination of its decisions will show. Such questions are generally questions of fact for the jury; but when under the rule the evidence presents a clear question of law, the court should decide the same as such, and not abdicate its functions to the jury.

The judgment of the district court is reversed, and the cause remanded.

*Reversed.*