Reed, J.,
delivered the opinion of the court.
The facts of the case are not complicated, nor the cause of the death involved in doubt. Except upon one or two points, which we shall consider hereafter, the evidence was not contradictory. While deceased was engaged in his duties in the mine, and in a position that would inevitably result in death if the cage was started, without having given any signal, and, as all the circumstances show, not considering the possibility, or at least any probability of its starting, Lercher, the dumper at the top of the shaft, signaled the engineer to hoist the cage, which he did, the act of hoisting being the sole and only cause of the tragedy.
Much testimony was introduced to show the dangerous inadequacy of the machinery and appliances for operating the mine, and that a less dangerous system of appliances might have been adopted and improvements introduced to *270 lessen danger. Statutes of the state in regard to the duty of a mine owner to do certain things for the safety of the men were invoked and cited.
It is apparent from all the evidence in the case that the machinery and appliances, such as they were, were in order at the time of the killing. The signaling lever at the bottom, handled by the cagers, the wires connecting with the bell or gong at the top of the shaft, the ways upon which the cages were run, and the signal connections of the dumper at the top of the shaft with the engineer were in operating order, and the death was not caused by any defects in any of the machinery or appliances, but by mistake or the gross carelessness of Lercher or of the deceased, or of both combined. Hence the admission of the statutes,- and of the evidence tending to show a want of compliance with statutory requirements, as well as the evidence of a self-constituted expert, showing that some more modern and less dangerous system of appliances might have been put in use, were improperly admitted. There was no claim or evidence that the lack of any of them caused or contributed to the injury.
If, under the existing circumstances, the cage was started bjr the engineer, neither the most modern and ingenious scientific appliances nor human agency in their use could have prevented the catastrophe. The evidencd and instructions of the court in regard to the duty of the defendant as to proper appliances and the requirements of the statute were inapplicable. Where the whole case made was one of carelessness, and not arising from any defective machinery, such eAÚdence and instructions presented false issues, Avhich could be found only prejudicial to the defendant by the jury.
In all eases of this character, sympathy and sentiment, with both judges and juries, are strongly in favor of those who have suffered the anguish and have been deprived of the support of those upon whom they were dependant. Consequently, courts are continually required to guard against collateral matters that might, if admitted, furnish an excuse *271 for an unwarranted verdict. It is extremely hard to keep such cases within the proper legal limits.
It is clearly established by a great preponderance of testimony that no signal to hoist the cage was given from below. .That the signal from Lercher to the engineer to hoist was given, was established beyond controversy.
The only questions necessary to be decided are: 1st, Was the appellant responsible for the mistake or parelessness of its employee, Lercher? If found affirmatively, then, 2d, Was the deceased guilty of such contributory negligence as to relieve appellant from the responsibilitj'- ?
It appears to have been conceded upon the trial, at least not controverted by the evidence, that Lercher and the two persons killed were fellow servants. Such having been the fact, the rule is: “ The master is not liable to one servant for an injury inflicted by another servant in the same common service, unless he can be charged with some degree of fault or negligence in their employment or retention.” The rule is so well settled both in England and America that a few leading authorities must suffice. Of the former, see Priestly v. Fowler, 3 Mees. & W. 1; Morgan v. Rd. Co., L. R. 1 Q. B. 149; Tursney v. Rd. Co., L. R. 1 C. P. 291; Feltham v. England, L. R. 2 Q. B. 33; Hutchinson v. Ry. Co., 5 Exch. 343; Tarrent v. Webb, 18 C. B. 797.
The cases of Bartonstall Coal Co. v. Reid, 3 Macq. (H. of L. Cas.) 266, and Same Co. v. McGuire, 3 Macq. 300, are more nearly parallel with the case under consideration than any others we can find. The deceased in those two cases were miners at work for the company; were let down and taken into the mine in a cage operated by the engine. The engineer was also in the company’s employ. Beid and McGuire were being drawn up in the cage. Through the carelessness of the engineer the cage was not stopped at the top of the shaft. Went on up, struck the scaffold with such force as to overturn it. The two miners were dashed to the ground and instantly killed. The court held as the killing *272 occurred by the negligence of a coservant, no recovery could be had.
Among the leading American cases, which are very numerous, a few may be cited where the same rule of law is asserted. See Railroad Co. v. Laning, 49 N. Y. 521; Flike v. Railroad. Co., 53 N. Y. 549; Farwell v. Railroad Co., 4 Metc. (Mass.) 49; Seaver v. Railroad Co., 14 Gray (Mass.) 466; Weger v. Railroad Co., 55 Pa. St. 460 ; Carle v. Canal & R. Co., 43 Me. 269; Davis v. R. R. Co., 20 Mich. 105.
Such being the rule in regard to nonliability where the injury was caused by the carelessness of a fellow servant, it is evident that plaintiff based her right to recover upon the fault or negligence of the defendant in retaining, in a responsible position, the man Lercher. Such negligence is charged in the complaint as follows, after charging Lercher with carelessness, neglect, insufficiency and unskillfulness: “All of which was known, or might have been known, by reasonable care by the defendant.” Again: “The said defendant was negligent in retaining in its employ so incompetent and negligent an agent as the said Lercher was, of which incompetence and negligence the said defendant had notice.” To recover upon this ground, it was necessary to establish by competent evidence the negligence of the defendant in hiring and retaining Lercher. See Edwards v. Rd. Co., 4 Cl. & F. F. (Eng.) 530. If a servant is generally known to be negligent and incompetent, the master is chargeable with negligence for not knowing what his reputation is. Wood, Mast. & Serv., sec. 421; Gilman v. R. R. Co., 10 Allen (Mass.) 233. But the bad reputation of the servant must be so general that negligence could be imputed for failure to make inquiry. Wood, Mast. & Serv., sec. 421; Davis v. Rd. Co., 20 Mich. 105; Wright v. Rd. Co., 25 N. Y. 566; Noyes v. Smith, 28 Vt. 63.
“ The master is only required to use reasonable diligence in the selection of competent servants, but he must perform this duty reasonably, and with reasonable reference to the nature of the employment, and the dangers incident to the *273 employment of unskillful or incompetent persons.” Wood, Mast. & Serv., sec. 421; Farwell v. Rd. Co., 4 Metc. (Mass.) 49; Beaulien v. Portland Co., 48 Me. 291; Wonder v. Rd. Co., 32 Md. 411.
The negligence of the master in employing unfit persons, thus rendering himself liable, is modified and controlled by another well established rule of law: “ When a coservant is injured through the incompentency of a fellow servant, and he knows, or has the same means of knowing of such incompetency as the master has, he cannot recover for injuries resulting to him from such servant’s negligent acts, because he is chargeable with negligence in not informing the master, if he knew the fact, or if he did not, is equally chargeable with negligence as the master for not knowing it.” Wood, Mast. & Serv., sec. 422; Davis v. Rd. Co., 20 Mich. 105. “ And if he did know of it, and with such knowledge remained in the service, he is treated as assuming all the risks incident to such incompetency or unskillfulness.” Wood, Mast. & Serv., sec. 422; Rd. Co. v. Barber, 5 Ohio St. 563; Hayden v. Mfg. Co., 29 Conn. 559; Skipp v. Rd., 9 Exch. 223; Seymour v. Maddox, 16 Q. B. 324.
The above being the rules of law controlling the liability of the appellant, it becomes necessary to examine the evidence.
Charles Hazlett: “Was in the pit near the cage at the time of the accident; came toward the cage with some loaded cars; the two cagers were sitting down on the other side waiting for coal. * * * They called to me, ‘ Have you got three cars?’ I answered, ‘ Yes,’ and one says to the other, ‘ Pass the empty car across the cage.’ One of them got up and started to push the car across the cage, and something-occurred that it went off the track, and I was assisting him to put it on. They both went to the car to push it across, and as the car left the cage — had just cleared — the cage suddenly went up, and the men were in a stooping posture, with their hands on the car. Of course, their heads came in contact with the timbers, their heads protruding out over the edge *274 of the cages, and as the cage was pulled up it turned their heads down between the cage and the side of the shaft; was standing with my hand on the cross timber of the shaft, waiting for this empty car; pulled the bell, and at the second pull the cage stopped; the cagers brought the ear from the north side and went to work on the south side; this was their reason for crossing the cage the way that they did; this was the ordinary custom in the mine and in the coal mines; at the time of the accident there was no one present except Fred Van Arsdale, myself and the two men who were killed; was in a position to see Mclver and Ranson about the time the cage started up; they did not signal for the cage to raise; was within a foot of the cage when it started; could have heard the signal if one had been given ; bell on top did not ring; could not say that I ever saw the cage go up before without a signal.”
F. H. Van Arsdale: “Was working for defendant at time of accident; was track laying; was at the shaft at the time of the accident; had been at the shaft two or three minutes before Hazlett came up; just before he came, I Avas talking with Mclver and Ranson; they were sitting down, talking to me; when Hazlett came up, I was going away; started to go south; the accident stopped me; was going aAvay and heard the cage start, and turned around just in time to see the cagers caught in the timber; ran back to the shaft; had one of the cagers gone from, where I first saw them to the bell pull, the chances are I would not have noticed him; Avhen I first noticed them, one of them was sitting down and the other was standing, leaning on the empty car that he had pulled off; Hutchinson was pit boss, and had charge of the underground workings; he directs the workmen underground; he directs repairs to apparatus; the cage went away before this accident without any signal; worked on top at dumping; the rattling of coal would sometimes sound like the ringing of the bell, and I would signal, and the engineer would start the cage; this occurred more than once when I was dump *275 ing. Hutchinson had charge of every man who worked below ; I meant in my testimony that I gave the signal to hoist, without a signal from below, but this was a year before, and Hutchinson was not pit boss at that time; when the cage started, Hazlett attempted to push the empty car back on the cage so as to catch under the timbers, but missing this, pushed the car into the dump, and then rang the bell.”
Samuel Paige: “Was a blacksmith, working for defendant about sixty or seventy feet away, at time of accident; can hear bell at shop; did not hear bell ring before the accident ; bell rang not over two or three minutes, if it was that long, before the accident; the cage came up, and then I heard no other bell before the accident; heard Hutchinson say they had started the cage, on December 2d, before they had run the car on it, and broke the guides; Lercher was dumper at that time ; the. same thing occurred again; repaired guides both times.”
CEOSS-EXAMINATION.
“ Was standing three feet inside the shop; heard bell signaling the engineer, but did not hear bell signaling dumpers ; not paying particular attention to bell; Lercher and S'tretz were working on the top at the time of the accident.”
J. B. Stretz: “Was dumping with Lercher at time of accident ; did not hear bell ring from below.”
CEOSS-EXAMINATION.
“ The bell may have rung without my hearing it; nothing to do with the ringing of the bell.”
Thomas Rosser: “Know of no occasion when cage was started, before the accident, without a signal from below.”
Mr. Rauson : “Have seen cage move without signal from below several times; Hutchinson knew of it; this was before the accident, but I can’t fix the time.”
CEOSS-EXAMINATION.
“ Heard Hutchinson say that they took the cage away before the ear was on. Mclver and Ranson were working there *276 at the bottom, as cagers, at the time when the cage was started without a signal.”
This was all the important testimony on the part of the plaintiff pertinent to the issues, up to this point. Plaintiff rested and defendant made a motion for nonsuit, which was overruled. On the part of the defendant, Lercher, the dumper, and H. De Gabbin, the weigher at the top of the shaft, testified that the gong was rung from below. C. W. Yan Olinda was the engineer. Knew nothing about the signal from below, was not in a position to hear, and was not his business or duty to listen; got his own signal and started the engine. Never heard any complaint, prior to the accident, that Lercher ever gave a signal to start without getting signal from below, and never heard that he was incompetent.
D. C. Bond: “Am mine clerk and manage the business under the superintendent. Mr. Simpson is a general superintendent of all the mines of The United Coal Company; he visits the Acme mine about once in two weeks for from fifteen minutes to an hour; never heard any complaint or intimation that Lercher had ever signaled to hoist the cage without signal from below ; the blacksmith reported to me that the guides had been broken ; he said the car had got off the track and the cage had struck against the guides and broke them; it was never reported or intimated to me that any accident occurred from the cage having been started without a signal from below ; never heard any rumor or intimation to put me on inquiry about any such thing.”
CROSS-EXAMINATION.
“Don’t know whether blacksmith saw guides broken; he reported how it occurred; the mines superintended by Simpson include the one mine of The Acme Coal Company, the stock of that company being owned by The United Coal Company.”
At this point it appears that the plaintiff again put in testimony supplementing that previously offered to make a case.
*277 Ben Neahoff, called by plaintiff testified: “Was running a machine that cuts out coal in the mine ; heard talk in the mine that cage started without signals ; this talk came to the pit boss all right; don’t know that it came to the knowledge of other officers; was not long ago that it came to the knowledge of the pit boss, perhaps about a couple of months ago; it was in December before the accident; Lercher was dumper at the time.”
CROSS-EXAMINATION.
“I heard Mclver say it and Hanson was there ; he said it to the pit boss; this was in December; he told them that they took the cage away without its being rung off; Hutchinson said that is an old game of theirs — an old game of the topman; that taking the cage away without being rung from the bottom was an old game ; that was all he said, and this was all that was ever said to Hutchinson that I know of; this was while Lercher was dumper.”
John Hutchinson, a witness for the defendant, testified: “Was mine boss at the time of accident; instructed the men who were killed to go around the manway and never cross the cages; we used the same system of signals which is generally used in coal mines; can’t say that either of the men who were killed ever complained of the signals that were used or asked to have them changed; never promised to discharge Lercher or in any manner interfere with the manner in which he discharged his duties as dumper at the mine ; received instructions from Mr. Bond and gave those instructions to the men to go around and not cross the cage; told the men who were killed, just like all others, not to cross the cage ; never saw any one crossing the cage without telling them not to do it; instructed them to use the manway and not cross the cage.”
CROSS-EXAMINATION.
“Been a coal miner thirty-seven years; worked in coal mines in England, Pennsylvania, Ohio, Indiana, Kansas and Colorado; been nine years in the Boulder valley ; it is about *278 six feet across a cage and a cage is about five feet the other way; cagers sometimes step on the cage, but it is not proper; generally there is a man at each side of the cage; they sometimes step on the cage, but, of course, they know it is not right; if an empty car is on one side of the cage and it is wanted on the other side, the ordinary course would be for the cagers to push the car on the cage and then go around the cage and pull the car off; that is the proper way to do ; that is the ordinary course; he should go around for fear of being killed; we are always looking for some accident; we have to do that; the starting of the cage is not the only danger ; something might fall down the shaft; if men pushed the cars on the cage and then went round and pulled it off there would be no danger at all of being hurt from the cage starting.”
REEXAMINATION.
“ The ordinary course of proceedings is for one eager to be on each side of the cage, and one to put a car on the cage and the other to pull it off; there is a necessity for a eager to pass around the manway sometimes, but no necessity for him to cross the cage at all.”
D. C. Bond, recalled, testified: “ My instructions to Mr. Hutchinson were to instruct all of the miners not to cross the cage, and especially to keep the, cagers off the cage, and that, when it was necessary to get on the other side, to go around the manway; never had any knowledge or information that these instructions were being disobeyed by the men; the manway is for the purpose of going around the cages ; the manway is for purposes of safety, and, also, would be needed to have a way to go around in case the way across was blocked up by the cages.”
CROSS-EXAMINATION.
“ The manway is for the purpose of all men walking around it; under the cages there is a sump about a foot deep with some water in it.”
John H. Simpson testified: “ General superintendent of *279 The United Coal Company; was superintendent of the mine when men were killed; had seven mines to look after; been engaged all my life, for thirty years, in coal mining; been in nearly all the coal mines of Colorado; our system of signals, in use at the time of the accident, was the general system that is carried out all through the country; neither of the men who were killed ever made any complaint about the system of signals in use upon the mine; we give instructions for no men to cross the cage or the cageway underneath, and have a place for them to go around at all of our mines.”
CROSS-EXAMINATION.
“ No complaint or notice on account of the way the dumpers acted in the ringing of the bells; thought the bells were all right; was at the mine two or three times a week ; gave special attention to see that everything was working properly ; heard of accident early in December, when guides were broken; heard of another in the middle of December; no change was made in signals by reason of these accidents, but the men were cautioned to be more careful.”
REEXAMINATION.
“We have accidents with the guides when the cages are running properly, and we have guides break; this occurs very often by the plates .that fasten the guides breaking off, and when the bells have been rung and the cage properly hoisted according to the ringing of the bells.”
The motion for a nonsuit should have been granted. No evidence of negligence on the part of appellant, in regard to Lercher, had been shown, nor any evidence that any notice of his negligence or incompetency had been given to any managing officer.
There was evidence that Hutchinson, the pit boss, had known instances when the cage had been taken'away without a signal; also that Hutchinson had charge of the men who worked below, but no evidence of any authority over men above, or even that it was his duty to inform the managers or in any way interfere, or that he did communicate *280 the fact to any one but the blacksmith, and then only as explanatory of how a break had occurred in the ways.
Nor were the jury warranted in finding a verdict for plaintiff upon the evidence, even when supplemented by that of Neahoff. He heard talk in the mine that the cage started without signals; that the fact was known to the pit boss. Didn’t know that it was known to other officers. He heard McIver say it to the pit boss in the presence of Ransom He told him that they took the cage away without it being rung off. That was all he said, and this was all that was ever said to Hutchinson that I know of. Plaintiff’s testimony nowhere shows any knowledge by the managers or those who were in control of the men upon the surface. Leaving out of consideration the evidence of Simpson, the manager, and Bond, who, under him, had charge, both of whom positively deny any knowledge, the testimony falls far short of establishing the knowledge of those in control, so as to charge the defendant with negligence in retaining Lercher. Another fact established by the evidence of plaintiff would preclude her recovery. If Lercher was careless in performing his duties, deceased were more cognizant of the fact, from their position and employment, than any others could be. They, as far as shown, were the only ones who ever stated the fact of his starting the cage without a signal.
In trying to establish by the evidence the negligence of defendant, too much was proved, enough to bring it clearly within the rule that no recovery could be had when the injured party, knowing the incompetency of his fellow servant, failed to report it to the master, or knowing the facts, remained in the service, “ assuming all the risks incident to such in competency or unskillfulness.” In addition to the authorities cited above, see Beach on Contrib. Neg., see. 140, and the long list of authorities sustaining the position cited in note 2.
We have no doubt of the correctness of these conclusions, and that for the reasons given the judgment must be reversed. If this were not so, the contributory negligence of the de *281 ceased, as shown by the plaintiff’s testimony, would prevent a recovery. We shall not discuss the alleged violation of a rule, shown to have been known to deceased, prohibiting workmen from crossing the cage in order to reach the opposite side of the shaft, as it appears not to have been enforced and habitually disregarded. But knowing, as shown, the carelessness of Lercher, and his repeated starting of the cage without a signal, the placing of himself upon the cage in the position shown was such gross contributory negligence as to prevent a recovery. It appears he was not required to be there by any exigencies of the occasion, nor was it the only way in which the service engaged in could be performed. It appears to have been purely voluntary, as the easiest way of crossing the car over.
The well established rule of law is: “ If the servant runs the risk with his eyes open, he will ordinarily have no remedy, no matter what the knowledge on the part of the master; Beach on Contrib. Neg., sec. 136. “ His right to recover will
often depend upon his knowledge or ignorance of the danger. If he knew of it, or was under a legal obligation to know of it, it was part of his contract, and he cannot in general recover.” Beach on Contrib. Neg., sec. 139, and authorities cited; also, Victor Coal Co. v. Muir, recently decided in the supreme court of this state, not yet reported (20 Colo. 320).
The judgment will be reversed and cause remanded.

Reversed.